

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| | § | |
| CARLOS GUERECA, | | No. 08-17-00242-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 41st District Court |
| | § | |
| THE STATE OF TEXAS, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC # 20140D00495) |
| | § | |

## **O P I N I O N**

A jury convicted Carlos Guereca, Appellant here, of sexual assault of a child. He raises two issues for our consideration: (1) whether the trial court erred in excluding expert testimony opining that the victim's school records did not show behavioral changes consistent with a child who had been traumatized; and (2) whether the State failed to present evidence of penetration, a necessary element of the offense charged. We reject both claims and affirm the conviction below.

## BACKGROUND

Appellant, aged 34, lived with his wife and children in a trailer park in El Paso. On April 13, 2013, Yoana Miranda and her four minor children came over to Appellant's residence for a cook-out. Yoana had known Appellant and his wife for some time, but it was disputed how close they really were, or whether Yoana had invited herself over that night. One of Yoana's children, D.M., who was fourteen years old at the time, accompanied her mother to the gathering. The

children were playing; Yoana and Appellant's wife were talking and drinking. Yoana ultimately consumed ten to twelve beers and decided she needed to spend the night rather than drive home. Yoana's children, including D.M., all went to bed around 10:30 or 11 p.m. and were all sleeping on one bed. Appellant got home from work around five o'clock and then left for a time, but had returned by 10 p.m. Appellant laid down on a sofa inside the trailer, while Yoana and Appellant's wife stayed outside to talk.

D.M. testified that sometime during the night she awoke to find Appellant with his hand under her pants, inside her underwear, and penetrating her vagina with his fingers. When she awoke, he said, "Oh, shit" and walked out of the room. D.M. stayed in the room for a while, but then ran out of the trailer and told her mother that Appellant had touched her. Immediately afterwards, D.M. was described as crying, screaming, and in shock. Yoana confronted Appellant and she began striking him. He denied doing anything and started to leave in his truck. Yoana, however, was holding onto the truck door while punching him. He drove away, causing Yoana to fall and injure herself, after which the police arrived. Appellant later contacted the police and gave a statement, denying that he ever touched D.M.

At trial, Appellant principally claimed that there never a sexual assault. He emphasized the lack of any injury to D.M. as found by a sexual assault examination conducted that morning. None of the DNA evidence collected linked him to the crime. Through counsel, he suggested that D.M. fabricated the incident, possibly as a reprisal for his refusal to loan Yoana money to catch up on her overdue car payments.[1] His counsel also developed through cross-examinations claimed discrepancies in details of the events, such as whether D.M. felt one or two fingers used in the assault.

---

[1] Yoana admitted to being behind on her payments but denied asking Appellant for a loan.

Nonetheless, the jury found Appellant guilty of the sexual assault. The jury assessed a ten-year sentence and $5,000 fine, which based on the jury's recommendation, were probated. This appeal follows.

## EXCLUSION OF EXPERT WITNESS

Appellant's first issue complains that the trial court excluded the testimony of Dr. James Schutte. Dr. Schutte would have testified that a sexual assault is traumatic to a child and would be expected to cause disruptions that ripple through several aspects of the child's life, including school. He reviewed D.M.'s high school records. From this review, Appellant intended to have Dr. Schutte testify that the records did not show any disruption in D.M.'s behavior at school which would have been expected had there been a sexual assault.

### Standard of Review and Controlling Law

A trial judge's ruling on the admissibility of expert testimony is reviewed for an abuse of discretion which we will not disturb if it lies within the zone of reasonable disagreement. *Russeau v. State*, 291 S.W.3d 426, 438 (Tex.Crim.App. 2009). A trial court abuses its discretion when its ruling falls outside the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990)(op. on reh'g). Stated otherwise, a trial court abuses its discretion when it acts unreasonably or arbitrarily without reference to any guiding rules or principles. *State v. Hill*, 499 S.W.3d 853, 865 (Tex.Crim.App. 2016).

For expert testimony those guiding rules and principles are found in the rules of evidence, including Rule 702, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. Additionally, Rule 705 provides

3

that an expert opinion is inadmissible if "the underlying facts or data do not provide a sufficient basis" for that opinion. TEX.R.EVID. 705(c). Case law has further clarified that for "expert testimony to be admissible under these rules, the proponent of the expert scientific evidence must demonstrate by clear and convincing evidence that the testimony is 'sufficiently reliable and relevant to help the jury in reaching accurate results.'" *Wolfe v. State*, 509 S.W.3d 325, 335-36 (Tex.Crim.App. 2017), *quoting Kelly v. State*, 824 S.W.2d 568, 572 (Tex.Crim.App. 1992). The proponent must prove (1) the expert is qualified (2) the testimony is based on a reliable scientific foundation, and (3) it is relevant to the issues in the case. *Wolfe*, 509 S.W.3d at 336, *citing Tillman v. State*, 354 S.W.3d 425, 435 (Tex.Crim.App. 2011); *Vela v. State*, 209 S.W.3d 128, 131 (Tex.Crim.App. 2006). "These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance." *Vela*, 209 S.W.3d at 131.

The trial court serves the role as a gatekeeper and must decide any preliminary challenge to a witness's qualifications and evidence's admissibility. TEX.R.EVID. 104(a); *Vela*, 209 S.W.3d at 131. In discharging this gatekeeper role, the trial court is vested with the often-difficult task of determining that which is irrelevant or is likely to confuse the jury in its decision-making process. *See Coble v. State*, 330 S.W.3d 253, 272 (Tex.Crim.App. 2010); *Holcombe v. State*, No. 08-17-00008-CR, 2018 WL 6629700, at *10 (Tex.App.--El Paso Dec. 19, 2018, no pet.). Nonetheless, the trial court's gatekeeping role "does not supplant cross-examination as 'the traditional and appropriate means of attacking shaky but admissible evidence.'" *Wolfe*, 509 S.W.3d at 336, *quoting Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 728 (Tex. 1998).

### The Testimony at Issue

The trial court heard the challenge to Dr. Schutte's testimony at the time of trial. The State's attorney took Dr. Schutte on voir dire and developed the following record: Dr. Schutte is

4

licensed psychologist. Several public agencies, including Child Protective Services, the Social Security Administration, and the Texas Workforce Commission contract with his practice to provide various evaluations. He assesses matters such as disability, competency to stand trial, vocational proficiency, and ADHD. His evaluations more typically involve a combination of a records review, a client interview, and the administration of psychological tests (including intelligence, IQ, academic achievement, personality, psychopathology, neuropsychological) as the situation may dictate.

In this case, he was provided with D.M.'s high school records starting with the 2013-14 school year up to the time when she withdrew from school in April 2017 to participate in the Job Corp. He had not met with D.M. or Appellant, and he administered no testing. His stated purpose in reviewing the records was to determine if there was "anything unusual or out of the ordinary" demonstrated by those records. He concluded that D.M.'s grades were consistent and there were no chronic behavior or disciplinary problems (other than one unprovoked fight). He represented to the trial court that he was prepared to testify to the opinion that there was nothing unusual in the school records. He also stood ready to answer any "questions that counsel has for me."[2]

### The State's Objection and Trial Court Ruling

The State objected to Dr. Schutte's proffered opinion claiming (1) he was not qualified to offer any opinions that would assist trier of fact in this situation, (2) he had never met with D.M.,

---

[2] The trial court also asked some of its own questions:

> COURT: Okay. So no report. Do you have any opinions regarding anything that would assist the trier of fact here?
> [DR. SCHUTTE]: Well, just that I didn't see anything unusual in these school records.
> COURT: So you don't find it unusual that she's having fights at school?
> [DR. SCHUTTE]: There was one fight in which she says that she was attacked by another student, but I didn't see an indication of a chronic behavioral problem.
> COURT: And how is that relevant to this case, if you know?
> [DR. SCHUTTE]: Well, in looking at these records, there doesn't seem to be a change in her functioning at school.

and (3) his records-only review would not help trier of fact to reach any relevant conclusion to the case. The trial court sustained the objection, reasoning that a records-only review "is highly insufficient" to qualify the witness to provide an opinion that would assist the trier of fact.[3] The trial court also stated it heard no "evidence at all about [Dr. Schutte's] expertise in traumatic events to adolescents."

## The Bill of Exceptions

Appellant then developed a bill of what Dr. Schutte would have testified to which included additional opinions not offered prior to the trial court's ruling, including this exchange:

> [APPELLANT'S COUNSEL]: Now, when a child or a person goes through a very traumatic event, do things like that leak out into the other person's life?
>
> [DR. SCHUTTE]: In a traumatic event -- which I have substantial experience with because I see traumatized children and adults on a regular basis in my office -- you would expect to see evidence of that in other areas of their life.
>
> For examples, changes in their behavior at home, changes in their emotional function, changes in their behavior/performance at school. That's what we say or what we're talking about when we say that trauma leaks into other areas of a person's life. You would expect to see some evidence of that in their daily function.

Appellant followed this with a hypothetical question, based on the facts of this case, to which Dr. Schutte responded that he saw nothing in school records "which would suggest to me that she had experienced a traumatic event which was impacting her daily life."

The bill further included an opinion that teenage children are unlikely to fabricate a story without some sort of external motivation. In responding to another hypothetical question, he agreed that a 14-year-old who learned her mother was denied a loan would be enough to make the child "lash out at the person who wouldn't lend them the money[.]"

---

[3] Appellant's counsel then requested that Dr. Schutte be allowed to interview D.M. that day, which the trial court denied. That ruling is not alleged as error on appeal.

**Discussion**

At the outset, when the trial court made its ruling, the opinion that Dr. Schutte proposed to offer was *only* that D.M.'s school records did not show any behavioral changes. As the trial court stated:

> All he is prepared to say here today is that he found nothing unusual in school records dated between February, more or less, of 2014 through April of 2017 when she quit school. That alone is insufficient for me to find that this expert is qualified to testify in this trial.

We would agree that this opinion, standing alone, was not relevant to the issue before the jury in the guilt-innocence phase of the trial. This opinion only became tied to the case with the additional opinion, testified to only after the trial court already ruled, that a traumatic event in a child's life would create effects that would leak into other parts of the child's life. Appellant carried the burden as proponent of the witness to show his qualification, and as proponent of the opinion to show its reliability and relevance. *Wolfe*, 509 S.W.3d at 335-36; *Kelly*, 824 S.W.2d at 572. He failed to meet this burden at the time the ruling was made.

Even taking the record as a whole, however, convinces us that the trial court did not abuse its discretion by excluding Dr. Schutte's later proffered opinions. First, the trial court's ruling raises a Rule 705 issue. *See* Tex.R.Evid. 705(c)("An expert's opinion is inadmissible if the underlying facts or data do not provide a sufficient basis for the opinion."). The data point upon which Dr. Schutte relied was limited to school records for a three-year period. He did not interview D.M., who testified in the guilt and innocence phase to experiencing panic attacks. Later in the punishment phase, she testified that the event affected her interpersonal relationship with her siblings and parents. She testified that the event altered her perception of strangers and changed the way she dresses. Nor did Dr. Schutte interview D.M.'s mother who had already testified that D.M. "wasn't herself anymore" was "really distant, and "crying all the time." Dr. Schutte admitted

7

that a review of records "is one piece of evaluation." When doing his assessments for other agencies, Dr. Schutte not only reviewed records, but also interviewed the clients, and as appropriate administered testing. His reliance on a single piece of the evaluation process failed to account for other indicia of disruption in the child's life.

Appellant's reliance on a records-only review raises Rule 702 issues as well. The Court of Criminal Appeals in *Kelly* set forth three criteria for Rule 702 reliability that the proponent of scientific evidence must prove: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Kelly*, 824 S.W.2d at 573. "Soft" sciences, such as psychology, are reviewed under a more flexible standard set out in *Nenno v. State*, 970 S.W.2d 549, 561 (Tex.Crim.App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex.Crim.App. 1999) (en banc); *see Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App. 2000); *Holcombe*, 2018 WL 6629700, at *5 (applying the *Nenno* standard to expert testimony in the area of psychology). Under the *Nenno* standard, the trial court should inquire as to whether: "(1) the field of expertise involved is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field, and (3) the expert's testimony properly relies upon or utilizes the principles involved in that field." *Tillman v. State*, 354 S.W.3d 425, 435-36 (Tex.Crim.App. 2011), *citing Weatherred*, 15 S.W.3d at 542.

The theory here is that a trauma of this type will cause disruptions that will leak into other areas of a child's life, such as schooling.[4] Other than Dr. Schutte saying that, Appellant presented

---

[4] In its brief, the State notes that it may present evidence that certain actions or conduct of a child are consistent with those of a child who has been sexually assaulted. *See e.g. Cohn v. State*, 849 S.W.2d 817, 819 (Tex.Crim.App. 1993) (allowing such testimony where record showed certain characteristics were empirically common among children who had been sexually abused). The State claims, however, that the converse is not true. Whatever the logic or truth of that assertion, we do not reach it here, but rather assume for this appeal that such testimony, if properly developed, might be admissible.

no other evidence to support the proposition. *See Weatherred*, 15 S.W.3d at 542 (sustaining trial court' exclusion of expert who supported theory of eyewitness identification "by simply offering [the expert's] testimony and nothing else."). But even assuming the theory is valid, the technique used to apply the theory must accurately assess the existence of disruptions in the other areas of the child's life. The trial court, through its own questioning, expressed skepticism that reliance on a records-only review of a single aspect of the child's life was a proper technique. He never testified that any of the *Kelly* or *Nemo* factors for reliability were met for a records-only review in a situation such as this.[5] "Unreliable scientific evidence is inadmissible because it 'simply will not assist the jury to understand the evidence or accurately determine a fact in issue; such evidence obfuscates rather than leads to an intelligent evaluation of the facts.'" *Wolfe*, 509 S.W.3d at 336, *quoting Kelly*, 824 S.W.2d at 572. The proffered testimony fails that test and the trial court did not abuse its discretion in excluding it.[6] Issue one is overruled.

## SUFFICIENCY OF THE EVIDENCE

In Issue Two, Appellant contends the evidence is legally insufficient to support the conviction because there was no proof of penetration of D.M.'s sexual organ as the statute requires.

## Standard of Review

Evidence is legally sufficient when, viewed in the light most favorable to the verdict, *any* rational jury could have found the essential elements of the offense beyond a reasonable doubt.

---

[5] *Kelly* provides a nonexclusive list of factors that might influence a finding of reliability: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the testifying experts; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person who applied the technique on the occasion in question. *Id*. Nothing in our record attempts to address factors 1, 3, 4, 5, and the 7th factor was disputed.

[6] Given the lack of a reliable foundation for the opinion, we need not reach the trial court's additional concerns with the witness's qualifications.

*Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex.Crim.App. 2010)(establishing legal insufficiency under *Jackson v. Virginia* as the only standard for review of the evidence).

The jury is the sole judge of credibility and the weight attached to the testimony of each witness. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex.Crim.App. 2014). It is the fact finder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007), *quoting Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. The jury also may choose to believe or disbelieve that testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex.Crim.App. 2008); *Belton v. State*, 900 S.W.2d 886, 897 (Tex.App.--El Paso 1995, pet. ref'd). When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination. *Dobbs*, 434 S.W.3d at 170; *see also Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789.

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone may be sufficient to establish guilt. *Dobbs*, 434 S.W.3d at 170; *Carrizales v. State*, 414 S.W.3d 737, 742 n.20 (Tex.Crim.App. 2013). Each fact need not point directly and independently to the guilt of the defendant, so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Dobbs*, 434 S.W.3d at 170; *Hooper*, 214 S.W.3d at 13.

We remain mindful that "[t]here is no higher burden of proof in any trial, criminal or civil, and there is no higher standard of appellate review than the standard mandated by *Jackson*." *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring). However, "[w]e are not to sit as a thirteenth juror reweighing the evidence or deciding whether we believe the evidence established the element

10

in contention beyond a reasonable doubt[.]" *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex.Crim.App. 1988). Instead, "we test the evidence to see if it is at least conclusive enough for a reasonable factfinder to believe based on the evidence that the element is established beyond a reasonable doubt." *Id.*, *citing Jackson*, 443 U.S. at 318.

### The State's Burden

We begin with what the State needed to prove by measuring the evidence against the elements of the offense as defined in a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex.Crim.App. 2009). By statute, a person commits sexual assault by intentionally or knowingly causing the penetration of the sexual organ of a child by any means. TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i). In this case, the jury heard descriptions of the female anatomy. The outer structure, termed the vulva, includes the labia majoria (or outer lips) and labia minora (inner lips). They enfold the vaginal canal, which in this case was also protected by an intact hymen. But consistent with Texas law, the term "sexual organ" and "penetration" were not defined in the charge.[7] *See Green v. Texas*, 476 S.W.3d 440, 445 (Tex.Crim.App. 2015) (affirming that it was error to define term "sexual organ" and "penetration" by reference to anatomical terms). Rather, the jury was free to "assign those terms any meaning that is acceptable in common parlance[.]" *Id.* And in our sufficiency review, we do not employ a more restrictive definition than the jurors themselves were legally entitled to use. *Vernon v. State*, 841 S.W.2d 407, 409 (Tex.Crim.App. 1992).

Looking to the ordinary meaning of the term penetrate, the *Vernon* court measured the sufficiency of the evidence of penetration against whether the defendant caused his finger to

---

[7] The charge read, "The law provides that a person commits the offense of Sexual Assault of a Child if the person intentionally or knowingly caused the penetration of the sexual organ of a child who was then and there younger than 17 years of age by any means by the Actor. Penetration is complete however slight."

11

"push[] aside and reach[] beneath a natural fold of skin into an area of the body not usually exposed to view, even in nakedness[.]" *Id.* at 409. Penetration occurs "so long as contact with the injured part of her anatomy could reasonably be regarded by ordinary English speakers as more intrusive than contact with her outer vaginal lips." *Id.* Penetration of the vaginal canal is not required. *Id.*

## Discussion

Appellant premises his argument on D.M.'s on direct examination at trial that was arguably ambiguous on the question of penetration. D.M. testified that Appellant "had his two fingers, trying to touch me. . . . [i]n my vagina area" and "trying to reach inside." She also testified:

[PROSECUTOR]: What did you tell your mom?

[D.M.]: That he was trying to touch me.

.     .     .

[PROSECUTOR]: And so you woke up to his hand under your pants and your underwear?

[D.M.]: Yes, ma'am.

[PROSECUTOR]: Did he have your [sic] fingers inside your vagina?

[D.M.]: It was almost in there.

[PROSECUTOR]: Did it hurt?

[D.M.]: Yes, ma'am.

[PROSECUTOR]: Do you recall how many fingers he had inside?

[D.M.]: Two.

.     .     .

[PROSECUTOR]: When you say that his fingers were almost inside, I need you to be more specific. What do you mean that his fingers were almost inside?

[D.M.]: I don't know how to explain it.

[objection and response omitted]

[D.M.]: I don't know how to explain it, but they were like -- I guess he was reaching for inside but --

12

COURT: You need to speak up a little bit.

A. I just don't know how to explain it.

.    .    .

[PROSECUTOR]: Did you feel his fingers inside your vagina?

[objection omitted]

[D.M.]: They were going in -- like, he was reaching up so I did feel --

Appellant's argument could be further buttressed by an expert pathologist who testified that he would have expected to find some redness, bruising, tears, or scratches on the vulva had a man digitally penetrated a sleeping 14-year old child. The doctor's own review of photographs taken at the hospital the night of the event, as well as the SANE nurse examiner's assessment, showed no injury to any area of the child.

But the record contains a good deal of other evidence supporting a finding of penetration. Appellant's own cross-examination of D.M. elicited direct evidence of penetration:

[APPELLANT'S COUNSEL]: All right. Now, I couldn't really determine what you had testified to this jury about what my client allegedly did to you. Would you tell me in your own words what you're saying that he did to you?

[D.M.]: He was penetrating my lips.

[APPELLANT'S COUNSEL]: Excuse me?

[D.M.]: He was penetrating my lips.

[APPELLANT'S COUNSEL]: He was penetrating the lips of your vagina? Is that what you're saying?

[D.M.]: Yes, sir.

.    .    .

[APPELLANT'S COUNSEL]: He penetrated your lips with two fingers?

[D.M.]: Yes, sir.

[APPELLANT'S COUNSEL]: Okay. How far in were they?

[D.M.]: I want to say like about this much -- (indicating).

13

[APPELLANT'S COUNSEL]: You know, I wear glasses, so you're telling me that he penetrated your lips that much or this much, or he didn't penetrate your vagina?

[D.M.]: He penetrated my lips -- I don't know the accurate measure.

[APPELLANT'S COUNSEL]: So is penetrating your lips penetrating your vagina?

[D.M.]: No.

[APPELLANT'S COUNSEL]: No?

[D.M.]: I don't know.

D.M. repeated multiple other times in the cross-examination that Appellant "penetrated" her "lips." But this was not the only evidence that bore on the question.

The first police officer to arrive spoke to D.M. and her mother; the mother told the officer that Appellant put his hand inside D.M.'s "underwear and penetrated her." The officer spoke to D.M. separately who told him that Appellant "had put his finger inside her vagina." A next door neighbor that evening heard D.M. say Appellant "put his finger inside of me."[8]

D.M. was taken by ambulance to a hospital. The ambulance transport records reflect that D.M. gave a history of a man who "had his finger inside her[.]" Medical records from D.M.'s admission that evening refer to a digital penetration to the "vaginal area" The history reflects she told medical personnel that "he had his hand inside me with his 2 fingers inside my vagina" and "Patient reports penetration with digit to female sexual organ"

She underwent a Sexual Assault Nurse Examination (SANE) that evening. The SANE nurse specifically asked about penetration and noted "digital penetration in the vaginal canal." The history given to the SANE nurse by D.M. claimed that Appellant "had his hand inside me with his two fingers inside my vagina." The SANE nurse found no injuries to any part of D.M.'s body.

---

[8] The scene was described as chaotic and yielded other conflicting accounts. D.M.'s father arrived later that morning and recalled that D.M. said Appellant "attacked me." Appellant's wife claimed that D.M. was saying Appellant had "raped her."

14

But contrary to Appellant's expert, the SANE nurse testified that this was not unusual in this kind of situation.

Finally, a detective spoke with D.M. days later and was told that Appellant stuck his fingers "in my part[.]" The detective sought clarification and was told that "I felt it in there but it didn't go all the way in."

Appellant does not address most of the above cited testimony. Rather, he relies on *Lozano v. State*, 226 S.W.2d 118, 121 (Tex.Crim.App. 1950) which overturned a rape conviction because (1) the State failed to corroborate the child witness's testimony, (2) the child did not make an immediate outcry, and (3) did not "complain of pain in her privates, as a result of the act[.]" *Id.* The case predates the evolution of our present standard of review, and the development of the law on what constitutes penetration under the Article 22.011. We are confident it does not control this case.

While there are conflicts in the testimony, the jury is tasked with resolving those conflicts. *Dobbs*, 434 S.W.3d at 170; *see also Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. A rationale jury could have concluded as it did that Appellant penetrated the child's sexual organ. We overrule Issue Two. Having already overruled Appellant's other issue, we affirm the judgment of conviction below.

June 12, 2019

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

15